United States v. Shannon Dozier The District Court erred when it granted the defendant Shannon Dozier's motion to suppress a loaded semi-automatic pistol and ammunition that were seized from his waistband after a consensual encounter with NYPD officers ripened into a lawful stop-and-go. nine-one-one call, in and of itself, also provides reasonable suspicion for a Terry's stop, and that's because the nine-one-one call had all of the indicia of reliability that this Court has recognized in multiple sets of cases. For example, the nine-one-one caller provided his name and call back number. But the officers didn't know that when they approached, did they? They did. They knew that it had the name and phone number because the officer had identified  When they first approached the car, they knew that the person who had called in had given their name? Yes, because Officer Gavousas had testified during the hearing that he had checked his ICAD before he reached the site of Ashland and Lafayette. And on that ICAD, it included the revised revision of the description, as well as the fact that the defendant, that the nine-one-one caller's name and call back number was provided, as well as latitude and longitude. But the description was still incorrect, right? It didn't match what he saw, what the officer saw when he approached the car. As to the clothing, but the point here is that the nine-one-one caller did provide a name, and the defendant, excuse me, the officer did know that there was a name and phone number provided, which is an indicia of reliability, separate and apart from But he also knew that the description didn't match the person who was standing in front of him. Right. Other than being a black male, the clothing description didn't match. Well, Your Honor, the clothing description not being a perfect match is not problematic under this Court's precedent in Patterson and Bold. And there, the Court determined that when there is a precise car at a precise location, the officers do have reasonable suspicion to approach that car and conduct an investigation. The matter of whether or not the defendant was wearing a green sweatshirt versus a black jacket is inconsequential to the question, because there is enough of a match that there is a precise car, make and model, a precise intersection, at 326 a.m., one minute after receiving the nine-one-one radio call. At that point, the officers had confronted a largely corroborated set of events and were within their duty, and in fact, probably were duty-bound to investigate the vehicle. That was what Officer Gavuzzo testified to, that he was going to investigate the vehicle, because there is a charge of a larceny in progress of a vehicle. I guess you would argue, then, that if the officers approach and he's wearing a green model jacket or whatever he was wearing that didn't match the original description, that it wouldn't make sense for the officers to say, oops, he has the wrong jacket on, we're leaving. It's exactly correct, Your Honor. And it's because at that point, the officers were responding to a larceny in progress of a vehicle. Their focus was the vehicle. They wanted to ask questions about the vehicle. And the first question that they asked, was this vehicle the defendant's, and he said it wasn't. At that point, they wanted to ask further questions. Whose car is it? The defendant then responded, she went that way. Who? The owner of the car. He was not providing concrete answers. All the while, at that point... Do you view those questions as accusatory? Those questions, Your Honor, the government submits were not accusatory. Saying that we got a 911 call about something. Is this your car? Whose car is it? That's not... Those are neutral questions, do you find? Well, Your Honor, I think identifying that they got a phone call is not, in and of itself, problematic. And I can pull the case citation, but this court has determined that providing information that the officer was investigating a crime is not, in and of itself, something that would ratchet up the interaction. Right, but it's partly, I mean, as you've noted, we're looking at all the circumstances. It's not that the single question or the single comment, we're responding to a 911 call. You're right. That, in and of itself, doesn't turn this necessarily into a seizure. But looking at all of the factors that we have here, the officers approaching, their headlights, I think the car lights were shining onto the... Yes, Your Honor. They approach him in a... I know you don't view it as blocking, but in some way they're in his path. And they're telling him, hey, we've got this 911 call. Is this your car? Whose car is it? What's going on? You look at all the factors, right? Yes, and when you look at all of the factors, and that includes the fact that the officers were dressed in plain clothes. There was nothing about their mannerisms that was threatening. They actually conducted the conversation in a very courteous, polite tone. In fact, I would argue that the defendant's interaction demonstrated that he was not threatened by the officers. He was laughing and smiling and calling the officers bro. He did not perceive himself to be in a situation where his will was being overborne because he was not, in fact, providing responses. And then when the officers requested his ID, he didn't provide it, and the officers didn't push him to provide it. He declined to provide his ID. He knew that he was not required to provide his ID. Therefore, he knew that he was free to leave because the officers did not further impose on him to provide his ID. There was also no prolonged retention of any of his effects. There was no request that he accompany the officers. There was no physical touching by the officers on his person. There was no display of weapon. In fact, the officers were in plain clothes and arrived in an unmarked vehicle because they were conducting an operation two blocks away where they were investigating a recent spike in car break-ins. So at that point in time, there was a high crime area, particular to that neighborhood, regarding car break-ins. And it was just the fact that they were two blocks away when that 911 call came in and were able to respond within one minute. Your Honor, I see that I'm very much over my time, but I'm happy to— No, it's an important case. I mean, you know, and as Judge Stack has pointed out, and I think all three of us would agree, it's an unusual case in this situation because, you know, there was a woman in the car. You know, that's kind of weird, but it happened. The officers only learned about that after they approached this individual. But the other question I have is when the officers approach and say, well, we got a report here of a crime of some sort, a possible break-in. I forget exactly what they said before the defendant responded. That might be—it could be construed, I suppose, as somewhat coercive. But on the other hand, it might be a normal way to start the conversation, which might allow the defendant to completely explain the situation in a way that satisfies the officers, that there is no problem here. That's exactly correct, Your Honor. The defendant could have identified a key in his hand, could have said that the car belonged to his friend. He could have responded in any number of ways. He simply responded that the car was not his. And for officers responding to a scene at 3.26 a.m. at a point in time when there was a recent spike in car break-ins, it was reasonable for them to want to inquire further. And so the question was, okay, so where's the owner? And the response that she went that way did not provide the officers with any further information for them to latch on to. I've got another question, and that is were the officers freed when there was a—this was a Terry stop. Were they free to frisk him at that point? Well, I think the cases are somewhat different depending on whether it's a drug case and the likelihood of a gun might be there because of the drugs. But if it's just a car case, do you have to have more before you can frisk? Yes, Your Honor. And at the point that the officers first approached, they did not have a reasonable suspicion to believe that the defendant was armed. That only came later on in the interaction when— So they were not entitled to frisk until they got, in your view, some reasonable suspicion that he might be armed. Exactly. It's reasonable suspicion that he was armed and there was criminal activity afoot. And both of those things— And where does that come from, the reasonable suspicion? You mentioned turning, his turning in the car, his taking his left side away from view, and also—and you mentioned blading. And there was—officers received training on blading, which is kind of a new term for me in a way. And then also, I suppose, the fact that the officers said at some point, you're leaning. I don't like the way you're leaning. And in fact, I guess that's me. I'm going back to the video, which I saw, leaning into the car a little too much. Is that—and thus maybe concealing something. So I think that there were a couple parts of the interaction, including the leaning. But there was also the fact that the officer lost sight of the defendant's hand. At one point, the officer testified during the hearing that he had seen both of his hands and that in one hand, in his left hand, there was a phone. But once the defendant shifted his phone from his left hand to his right hand and then proceeded to obscure his left hand along with the left side of his body— to the ultimate frisk? Yes, Your Honor. There was an initial shift that I guess it shifted back. And at that point, Officer Gavouzis— So it went from right hand to left hand and then left hand back to right hand? I think it was left to right, back to left, and then back to right. But the extended time, the second time with his left hand, along with the additional shifting, the fact that it's been happening now over 90 seconds, I think that Officer Gavouzis was looking at the situation through the eyes of his training and his experience and also trying to assess what was happening at that moment. And at that moment, he's continuing to see, excuse me, a shift towards the defendant trying to obscure his left side and now no longer being able to see his left hand. And Officer Gavouzis was very plain on the body camera. He said, I don't like the way that you're leaning. There was no post hoc rationalization. This wasn't something that was conjured up later on. It was—that is some indication that he was—you know, he puts it on the record at the time. Exactly, Your Honor. And so the officer was—by that point, he was getting concerned. But by that point, the officer's concern had materialized to a point that he believed that he wanted to conduct a limited pat-down. That's exactly what he did. He did not pat any place else except the defendant's left waistband, where he believed that there was a firearm. And, in fact, there was a firearm because— So he didn't have to believe it. He had to suspect it, right? Exactly. He suspected it and he had a reasonable suspicion based on the bleeding, which, as this Court in its en banc decision in Weaver indicated, furtive movements, especially around the body, around the mid-waist, would be something that is relevant to an officer considering whether or not there is reason to believe that someone is armed. All right. As an assistant U.S. attorney, I think I should remind you that you're sitting on that side of the roster. It must be quite unusual for you. This is actually my second, Your Honor. All right. Thank you. We're about out of time. Thank you. Good morning, Your Honors. My name is Siobhan Atkins. I'm from the Federal Defenders of New York. On behalf of Apolli, Shannon Dozier. So, as Your Honors have discussed at length, there are two independent bases to affirm the district court's ruling here. One, the officers lacked reasonable suspicion to conduct a terry stop. As Your Honors have identified, the correct test is whether, in fact, a reasonable person would have felt free to leave at the beginning of the encounter with the officers. A reasonable person would have not felt free to leave. But two, even if they did have the suspicion to stop and question Mr. Dozier, there's still the question of whether or not they possessed the reasonable, individualized suspicion to believe that Mr. Dozier was armed and dangerous. And they did not. And I'd like to just begin there, and then I'd proceed to discuss the terry stop. The officers lacked the reasonable, individualized suspicion based on the district court's well-supported factual findings about what occurred when the officers approached Mr. Dozier. As the district court found after reviewing the testimony and the body cam footage, Mr. Dozier stood normally. He turned in the officers' directions as they strode towards him. He then stood with his back to the open car door so that he wasn't blocking the officers' view of what was inside the car, and also so that he could speak with everyone. He did not reach towards anything. Yes, he remained with his back. It seems to me that that latter is a possibility. His position did not change in any meaningful respect. He remained with his back towards the car door. He was looking at his phone at one point. But regardless of— Slow down. Yeah. Was he, at that point, was his head turned or was he facing the officers when he was answering the questions? So he remained with his back towards the car door, which meant that he was—he was turning to talk to Officer Grubuses. Officer Cruz was in front of him. The occupant of the car was to his left. So he did have to occasionally turn his head to speak to the officers. But as the district court found, again, after reviewing all the circumstances of the evening, the angle of the car door, the position of the different occupants, concluded that this was not a furtive way to stand. It was a natural body movement. And that factual finding is entitled to deference so long as it's a permissible view of the evidence. I take your— Answer this. It's not surprising but interesting that you are—your colleague practically never mentioned the district court at all. You, of course, are talking a good deal about it. To what—to what extent— Nothing. —do we concur? What is the district court's role in this unusual case where we're looking at what we think was this or wasn't—do we think was the same evidence the district court was looking at? The district court had benefit of not just the body cam footage but also the testimony of Goulouse's, had the ability to assess his credibility, his demeanor. And so the fact remains that this court applies clear error to factual findings, which—and that was all the way that—the factual findings about the way Mr. Dozier was standing, the factual findings about the way Mr. Dozier responded to questions. Are there—can I just ask you—I mean, I'm also interested in this issue of sort of what are the factual findings and what are things that are maybe not factual findings? And so, for example, when you mentioned the idea that him turning in terms of when they approach his first party, that the district court concluded those were natural movements. Is that a factual finding or is that a sort of a characterization or conclusion about the—what we should take from the way he moved? Yeah. No, it's an excellent question, Your Honor. But it's the factual inferences and facts themselves that are all subject to clear error. And I think the Arvizu Supreme Court case cited by the government in their brief actually illustrates this pretty well. And Scalia's concurrence explains that when a district court not only, you know, finds facts but characterizes the way, for example, someone is moving as normal or abnormal, that is, in fact, a fact to be found and one that a resident district court judge is in the best position to—a factual finding the resident district court judge is in the best position to make based on all their experience and review of both footage and testimony. Well, it's an opinion by the district judge that it's normal. And I—one of the questions I would have is based on what? You know, we can all see and we all learned in first-year evidence class that everybody has sort of a different take on what the facts are. But as a general matter, I guess we would say that this district court is entitled to deference unless it's clear error. And that's what I'm wondering about because we're exposed because of the tapes. We really have 90 percent of what the district court had before her. We don't have the credibility of the witnesses' testimony on the stand. But I'm trying to figure out how much that plays in this case. So, I mean, I certainly don't read the government to be arguing for de novo review, and I think that's for good reason, right? So these are still factual findings subject to clear error, and I think that's for a good reason, right? Because a lot of what the district court eventually found about what occurred was not just about the video, but also about Guvisi's demonstrated inconsistencies with it in the way he was testifying and the way he was responding on the stand. So, for example, you know, he characterized that Mr. Dozier as twirling at the beginning of the encounter and said that he turned all the way around. And that formed the basis of his conclusion that he later used to justify the frisk that Mr. Dozier was blading and leaning into the car. And the district court said that's simply not what occurred. Evaluating Guvisi's demeanor, that did not match what it was observing on the video. And those are all, you know, again, factual findings that the district court was well-equipped to make. But that did, in part, depend on the officer's testimony and determining whether the officer was credible or not credible. I think that, don't you think the case really comes down to the question of was there a reasonable suspicion, reason to suspect that he might be armed? As opposed to all of the preliminary, you know, the phone calls and approaching the person and free to leave and all of that. But once you're there, you still have to come to a reasonable suspicion that he's armed. Is that correct? Absolutely. And the officers must have reasonable, individualized suspicion. And that's an objective test. It's not a subjective one. So the district court is positioned to – a district court is, in fact, required not to simply accept the police officer's judgment. That's from the Bayless case. It has to come to an independent conclusion. The officer did not do a complete pat-down, but it was a targeted pat-down on the pocket on the left side. But that may have indicated a concern that there was a weapon on the left side as opposed to somewhere else. Maybe I'll come up with something or, you know, just do a kind of a generalized search. Your Honor, a frisk is a frisk all the same. The standard is the same regardless of where the frisk occurred. And, again, an officer's subjective hunch does not give rise to the objective, particularized, reasonable suspicion. So simply that an officer may have believed a gun was on the left side does not mean that a district court is entitled to accept that conclusion or that a reasonable officer would have believed that in the circumstance. So I simply think that the fact that he patted down the left side, a frisk is a frisk all the same and, again, is an objective test that does not turn on whether the officer had a hunch or not. Yeah. Well, there are two broader principles here, it seems to me. One is that, you know, did the officers act appropriately in accordance with the rules that the law has set up or was the officer wanting to be as sure as possible that there wasn't going to be a shooting or some sort of weapon? Because under those circumstances at 3 o'clock in the morning, you know, people have been known to pull guns on officers. And so every officer, it seems to me, is concerned about the possibility of there being an armed person that they're dealing with. But they have to – obviously, that's not enough. Every officer is concerned. But on the other hand, maybe it explains some of the behavior on the part of this particular officer. Perhaps, Your Honor. But, again, I think as Your Honor recognizes, it's not enough that an officer have a concern. They have to have – that concern needs to be reasonable. And, thankfully, this may be a closed case, but this is what district court judges are for. The district court judges are in the best position to assess the facts. You know, they're residents of the area. They can view the testimony, not only just the footage that Your Honors have access to, but an officer's demeanor, and conduct those factual findings in the first instance. I hope that there's substantial case law, which I suppose if my record agrees more carefully, I want to know what it was. But I assume there's substantial case law involving situations where the court of appeals had pictures of what went on rather than simply reviewing the evidence, the secondhand or more secondhand evidence. I'm just commenting on it and just saying that there must be some case law that we ought to be looking at as to how we usually handle situations like that. That's correct, Your Honor. I'm not aware of a single – I mean, certainly with the advent of body cam footage, it's not all that uncommon that this court would have, you know, footage of the encounter at the same time. I'm not aware of a single case – the standard remains clear error for good reason, because this case is not just about footage but testimony. And, you know, it's not – certainly, again, the government is not arguing for any different standard of review. The district court is still in the best position to assess the facts in that situation. So the more plain, visual evidence we have before us, the more likely we are not to properly refer to the district court as a source? Well, yes. I mean, I certainly – the standard is the standard. I, you know, I won't pause you, if I know what your Honor's deliberative process is. I mean, I think the video in this case is helpful, because it shows that the district court's, you know, factual findings, which are, again, rooted in – can only be reversed for clear error, you know, were sound here. Your Honor's talked about the factual finding that he was boxed in. That was amply supported by the record. The fact that he was, you know, positioned naturally – again, you know, perhaps, Your Honors, even if you think it's a closed case, the district court assessed the testimony and the video and concluded that Mr. Dozier was standing naturally. I also want to briefly respond to the concern. Well, the district court also made findings of accusatory statements and rapid-fire questioning, which she thought was too broad, and therefore we can't fault the assessment for broad answers that are not conclusive. And that part of the analysis gave me a little bit of problems, because I was actually able to watch the kind of the testimony, the question, and listen to it based on both body cams, and also whether it was accusatory or not. And she reached that conclusion, but I – that could have been error. But at the same time, it might not have been error for her to conclude that there was no specific – not enough for reasonable suspicion about the firearm. Yes. So just to respond briefly to the questioning, Your Honor's question about the questioning, your question can be both accusatory and open-ended at the same time. You know, the officer – and I believe, Your Honor, had suggested that the officers had said, oh, we got a call about a break-in. That's not what they said. They said, is this your – who's your – is this your car? We got a call. Is this your car? We got a call. Is that – is this your car? That's a question that is both accusatory but doesn't necessarily lend itself to an easy answer. Mr. Dozier doesn't know that they're investigating a break-in. He could possibly think they're investigating, you know, say, someone reported an argument between him and the owner of the car who stepped off. They could be responding to, you know, a report of a car parked illegally. So I think that's all. If it is his car and he can establish it, that's the end of the inquiry. The officers go on to back to their other job that they were working on. You know, that's just a shortcut way of getting – basically laying down some ground. Right. Well, he answered the question honestly. He said, you know, the owner of the car is over there. But that's all to say that, you know, a question can be accusatory and open-ended at the same time. But I want to end with, you know, your – the second part of Your Honor's question, which is about the reasonable suspicion for a frisk, which, again, the factual findings underlying that – the justifications for the frisk, which is about – entirely about, you know, how he was moving – how Mr. Dozier was moving, how he was responding to questions. Those are all reviewed for clear error, and there was no clear error in the district court's findings on that score. All right. Let me ask one fact question. He was cuffed during the – during the frisk, and my understanding was that at that point the officer had felt something that could be a gun but wasn't doing a complete search. Is that correct? When he put the cuffs on? He was doing – he was conducting a frisk. He was conducting a pat-down of Mr. Dozier's body. That he started with one part of the body does not mean that there's a different standard. But what point was he cuffed? I'm asking a question. Yeah, yeah, yeah, yeah. I mean, I believe the officer conducts the frisk in that he pats down the left side of his body, feels something that he believes might be suspicious, then handcuffs him and reaches into – and then – Right. But a pat-down is a pat-down all the same. Yeah. No, I mean, it's a – cops cuff all the time. Yeah. Just to, you know, avoid a controversy or avoid resistance or whatever. No, I'm – at what point do you think he was – he was not free to leave? Apart from the initial argument that you're making. Sure. In connection with the – with the frisk itself. In connection with the frisk? When was he seized, I guess, is the way to put it. When was he seized for the purposes of a Terry stop? Or when was – when did the officers need reasonable suspicion to believe he was armed and dangerous? At that point. Yeah. At the point at which he was patted down. Okay. Thank you very much. Good morning again, Your Honors. I have a few points to respond to, to my colleague's opposition to the government's appeal here. In the first instance, Your Honors asked about whether or not your – the availability of the video is something that you guys can consider when you review the district court's decision under the clear error standard. And it is. Under this – under the Supreme Court's decision in Scott v. Harris, the court found that clear video evidence can overcome the rule of drawing all inferences in favor of a plaintiff at a summary judgment stage of qualified immunity. And that would be the same status here. There is no deference to be owed when you have in your possession the clear video and the clear video showing, as Judge Walker noted, 90 percent of the interaction. As to my colleague's reference to the testimony and a credibility finding, there was no credibility finding as to Officer Gavouzis. The district court's characterization with respect to the word twirl and that she did not find the use of that word to be credible has nothing to do with the defendant's – or, excuse me, the officer's overall credibility. There was nothing in the opinion that indicated anything about Officer Gavouzis' credibility or his honesty or something that would allow the district court to believe that he testified in any way other than honestly in connection. It's not really, though, a question of whether or not the court is finding that he is not testifying credibly. I think the point is more just that the testimony is also being weighed by the district court in addition to the video. Yes, Your Honor. And in that instance, Officer Gavouzis was using a term twirl or spin to characterize what the defendant did. And the defendant did. He was facing away from the officers. His back was entirely turned. And he turned almost entirely around to be able to stop so that he is facing into the car with his head craned over. That is not a natural body position. It is not natural to turn almost entirely around rather than face the officers. Your Honor, Judge Walker, you noted that the court characterized the question as accusatory and rapid-fire and vague. And those are characterizations that the government does disagree with. Do you agree that those types of things are part of a factual finding? We have cases where district court judges have found that a defendant was being evasive and that that's part of the factual finding. So if evasive is a factual finding, why is it natural movement but not a factual finding? As to natural movement, Your Honor, I think that there— In fact, that seems more like a factual finding, honestly, to say a movement is natural than to characterize a behavior as evasive, which is certainly more loaded, I think. I think, Your Honor, that the court conflated factual findings with characterizations. The court looked at the video and determined that the defendant facing away from the officers but craned his neck all the way around is a natural body position. That isn't a factual finding. It's a characterization of her assessment of the situation rather than using the standard, which is a reasonable officer guided by his training and experience in the crucible of the moment. The standard is not subjective as to the court. It is what does a reasonable, objective officer believe the situation to be transpiring to indicate to him. And he testified that based on his training about blading, based on his observation of the defendant continuing to lean his body away, the fact that he could no longer see the phone or, excuse me, could no longer see the hand because he moved the phone away, those were all consistent with his training. And those were things that the court discounted because the court took each element discreetly and identified an innocent explanation. And that is inconsistent with this Court's plethora of opinions, that it is a totality of the circumstances assessment. You do not take each one and indicate, well, there could be an innocent excuse for this, and then discount each of them. It is a collection of all of them. And maybe each one individually cannot meet the burden of reasonable suspicion, but together, all together, what the officers had was a late time of night 911 call in an area experiencing a high uptick in car break-ins, reporting a car break-in, a specific car, a specific location, one minute after the 911 call, and an individual who was standing in front of an open door. The officers had reasonable suspicion that ripened over time. They didn't have reasonable suspicion to frisk him at the very moment that the encounter began, but because of the leaning, the blading, the loss of the sight of the hand. And, Your Honor, I also want to add just one, if I may. Yes, go ahead. My colleague indicated that the credibility of Officer Gavus, and I touched on this earlier, was somehow indicated through her suggestion that the word twirl and other words. And I want to emphasize that an officer using his own words to describe what he was perceiving is not, in and of itself, an item to identify as a part of a credibility assessment. It is whether or not he was being honest. The court's disagreement with characterizations is not a factual finding. Rather, it is just simply what the court determined. And Your Honors are equipped with body camera footage, with the radio run, with the transcript, the map, to make that determination based on the evidence. And based on the evidence, the court committed clear error here. Thank you, Your Honors. Very well argued, both sides. Thank you, everyone. We'll take the case under advisement.